**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(Civil Division)**

| | | |
|---|---|---|
| **HAROLD C. LINDSEY,** | ) | |
| **Plaintiff,** | ) | **Civil Case No.: 07-01939 (RBW)** |
| **v.** | ) | |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) | |
| **Defendants.** | ) | |

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANT DISTRICT OF COLUMBIA'S
MOTION FOR JUDGMENT ON THE PLEADINGS**</u>

NOW COMES the plaintiff, Harold Lindsey, by and through his attorneys, Donna Williams Rucker and DuBoff & Associates, Chartered, in Opposition to Defendant District of Columbia's Motion for Judgment on the Pleadings ("Motion") and the Rules of this Court, and respectfully moves this Honorable Court to and deny defendants Motion. In support thereof, plaintiff states as follows:

1.     Defendant District of Columbia filed a Motion for Judgment on the Pleadings on or about July 23, 2008.

2.     Plaintiff has properly stated a *prima facie* case under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 for which relief may be granted.

3.     Plaintiff's claims are not barred by the doctrine of *res judicata.*

4.     Defendant is not entitled to judgment on the pleadings.

5.     Plaintiff's present action sets for new grounds for the claim in this case which are not grounded in the exact same facts.

6.      Plaintiff has attached a Memorandum of Points and Authorities that more fully sets forth Plaintiff's Opposition to Defendant District of Columbia's Motion for Judgment on the

Pleadings, and the same is incorporated herein by reference.

WHEREFORE, the plaintiff respectfully prays that this Honorable Court deny Defendant District of Columbia's Motion for Judgment on the Pleadings, grant a hearing in this matter, and grant such other and further relief as deemed just and appropriate.

Respectfully submitted,

By:    __/s/_ *Donna Williams Rucker*_____
Donna Williams Rucker, Esq., 446713
DUBOFF & ASSOCIATES, CHARTERED
8401 Colesville Road, Suite 501
Silver Spring, Maryland 20910
(301) 495-3131    Office
(301) 587-1872    Facsimile

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing **Plaintiff's Opposition to Defendant District of Columbia's Motion for Judgment on the Pleadings, Memorandum in Support thereof, attached Exhibits and proposed Order** were sent via the Court's Electronic Case Filing, this 19th day of August, 2008, to: C. Vaughn Adams - Assistant Attorney General - 441 4th Street, N.W., Sixth Floor South, Washington, D.C. 20001.

__/s/_ *Donna Williams Rucker*_____
Donna Williams Rucker

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**
**(Civil Division)**

| | | |
|---|---|---|
| **HAROLD C. LINDSEY,** | ) | |
| **Plaintiff,** | ) | **Civil Case No.: 07-01939 (RBW)** |
| **v.** | ) | |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) | |
| **Defendants.** | ) | |

## EXHIBIT LIST

1.  Complaint

2.  Plaintiff's Deposition

3.  FSI Letter dated 2-25-01

4.  DeSilva Deposition

5.  FSI Letter dated 4-16-02

6.  Vacancy Announcement 12-1-06 to 12-15-06

7.  Vacancy Announcement 5-3-06 to 6-2-06

8.  EEOC Charge 6-12-06

9.  Notice of Suit Rights 7-30-08

10. Thompson Deposition

11. Vacancy Announcement 8-16-01

12. Vacancy Announcement 7-4-02

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(Civil Division)**

| | | |
|---|---|---|
| **HAROLD C. LINDSEY,** | ) | |
| **Plaintiff,** | ) | **Civil Case No.: 07-01939 (RBW)** |
| **v.** | ) | |
| **DISTRICT OF COLUMBIA**, *et al.*, | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S  OPPOSITION TO DEFENDANT DISTRICT OF
COLUMBIA'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff Harold Lindsey, by and through his undersigned counsel, respectfully offers the following Memorandum of Points and Authorities in support of Plaintiff's Opposition to Defendant District of Columbia's Motion for Judgment on the Pleadings and further states as follows:

**I.    PROCEDURAL HISTORY**

Plaintiff filed a cause of action, on or about August 12, 2002 in the case of *Lindsey v. District of Columbia, et al*. Case Number 02-1592 alleging Age Discrimination.  Defendant's filed a Motion for Summary Judgment in that case.  On or about February 3, 2008, the Honorable Judge Rosemary M. Collyer issued a Memorandum Opinion granting the Defendant's Motion for Summary Judgment.

**II.    FACTS**

**A.    FACTS KNOWN AT THE TIME OF PLAINTIFF'S FIRST COMPLAINT**

Plaintiff began working for the Defendant Fire and EMS Department in November 1979 as a firefighter. (Complaint ¶10; Exhibit 2 pg. 9-3).  (Complaint attached as Exhibit 1 and

Plaintiff's Deposition attached at Exhibit 2).  In 1989 plaintiff was promoted to Inspector; in

1991, he was promoted to Fire Inspector and plaintiff was promoted to the rank of Sergeant in

January, 2001.  (Complaint ¶10, Exhibit 2 pg. 21, 10-14).  Plaintiff had received extensive

training in the area of Fire and Arson Investigation. He was nationally certified as an Explosive

Fire and Arson Investigator and had testified as an expert in a number of criminal trials.

(Complaint ¶12; Exhibit 2 - pg. 125, 19-22; pg. 126, 1).

     Plaintiff became a Sergeant within the District of Columbia Fire & EMS Department in

2000.  Plaintiff worked as a canine handler with the canine Augi before that dog was retired.

After Augi retired, and after plaintiff's rank moved to Sergeant, defendant District of Columbia

sent plaintiff to become certified as a canine handler with the canine, Taz.  (Exhibit 2 – Pg. 117,

5-11).  Therefore, plaintiff became certified as an Accelerant Detection Canine Team with Taz

after he attained the rank of Sergeant.

     Plaintiff became the only member of the D.C. Fire Department to be certified to work, in

conjunction with his trained dog, as an Accelerant Detection Canine Team. (Complaint ¶13,

Exhibit 2 pg. 88, 22; 89 1-3).  Certification as an Accelerant Detection Canine Team required

substantial training and work on the part of the plaintiff, and a period of training, and more

importantly, bonding with his canine partner. (Complaint ¶14, Forensic Scientific Investigations

("FSI") Letter dated February 25, 2001 attached as Exhibit 3).   Individuals are not certified

alone; they are certified as part of a team that includes the handler and his dog. (Complaint ¶15,

Exhibit 3).

     At the time Plaintiff was removed from his position there was no other member of the

Defendant Fire Department who was trained or certified to work in this field.  (Complaint ¶15,

Exhibit 2 pg. 88: 22 – 89:1-3). DeSilva, who replaced Plaintiff, was not qualified for the position on the Accelerant Detection Canine Team working with Taz. (Exhibit 4- pg. 26, 14-16).

The president of  FSI, the Company that certified Taz and plaintiff as an Accelerant Canine Detection Team, told the Fire Department, upon learning that Taz had been transferred to DeSilva that plaintiff and Taz were certified as a team and breaking up the canine and handler would nullify the certification. FSI further stated "we would have strongly advised against the splitting of a properly certified scent detection team." FSI officially de-certified plaintiff and Taz after the Fire Department removed plaintiff as the Fire Department's canine handler and gave Taz to DeSilva. The training plaintiff and Taz received certified them as a team.  FSI policy is to match a canine and handler based on personality profiles: plaintiff and Taz were evaluated based on stringent company guidelines and were paired together. (Exhibit 3).

As a certified accelerant canine handler, plaintiff was on call twenty-four (24) hours a day, for the care, training and maintenance of Taz, and as such was given guaranteed overtime pay to compensate him for the time spent outside of normal working hours in completing those duties. (Exhibit 2 -  Pg. 62, 12-22; 65 1-17). When plaintiff was removed from his position as canine handler, he lost guaranteed overtime pay and the commensurate benefits that go along with the guaranteed pay he had been receiving. Specifically, plaintiff was guaranteed 2 hours of additional pay as the canine handler 365 days a year. (Exhibit 2 - Pg. 62, 12-22; 65 1-17). Plaintiff was subject to a significant change in benefits. As a canine handler, plaintiff automatically earned two hours of overtime pay each day 365 days a year. When plaintiff was ordered to turn Taz over to the younger DeSilva, plaintiff lost that guaranteed overtime pay.

As a result of defendant removing plaintiff as the canine handler and giving the canine to

DeSilva, FSI decertified Taz and the plaintiff, leaving the District of Columbia without a

properly trained Accelerant Detection Canine Team; the only department in the area without

such a team.  (Complaint ¶23, Exhibit 5; Exhibit 2 pg. 114, 21-2; 115, 1-10).  After Taz was

taken from plaintiff by the Fire Department, and given to DeSilva who, is younger than plaintiff,

and who possessed no experience as a canine handler, Taz's performance dropped, resulting in

the dog being given away as a house pet because he was no longer able to perform the functions

he had once been trained to perform.  (Complaint ¶24).

> **B.      FACTS *NOT KNOWN* AT THE TIME OF PLAINTIFF'S FIRST
> COMPLAINT**

The Defendant Fire Department sent Mr. DeSilva for training and certification as an

Accelerant Canine Detection Handler. (Complaint ¶26).  Upon information and belief Mr.

DeSilva was removed from his position as Accelerant Canine Handler in November or

December of 2005 and Penny was decertified. (Complaint ¶27 & 28).

After Mr. DeSilva was removed as the Handler Sergeant Proctor was given provided a

new canine named Sparky.  (Complaint ¶29).  Defendant Fire Department appointed Sergeant

Proctor as the Accelerant Canine Detection Handler without advertising the position.

(Complaint ¶30).  Sergeant Proctor, the newly appointed Handler was a Sergeant and Plaintiff

serving as Sergeant and canine handler is in direct contravention of the reasons Plaintiff was

offered at to why he was removed as the Handler.  (Complaint ¶31).

After Sgt. Proctor's appointment, the Defendant Fire Department sent Sgt. Proctor for

training and certification as an Accelerant Detection Canine Handler where he was paired with

Sparky.  (Complaint ¶32).  With Sergeant Proctor as one dog Handler, the Fire Department

placed a vacancy announcement for the position of "Fire/Arson Investigator, Armed/Canine

Handler".  (Complaint ¶33).  The Fire Department placed a Vacancy Announcement for the

position of "Fire/Arson Investigator, Armed/Canine Handler" with an effective date of December

1, 2006 through expiration date December 15, 2006 wherein it stated under eligibility "Members

of the Department below the rank of Sergeant, with (5) years accredited service with DCEMS".

(Complaint ¶34 and Exhibit 6 – Vacancy Announcement 12-1-06).  A prior announcement on

May 3, 2006 did not contain any restrictions on whether or not a Sergeant could apply for the

position as a dog handler. (Exhibit 7).

The Fire Department than placed a white individual, named Mr. Scott Wilson into the

position as an Accelerant Detection Canine Handler.  (Complaint ¶35).  Upon information and

belief Mr. Wilson is under the age of 40. (Complaint ¶36).

## III.    STANDARD OF REVIEW

### A.      JUDGMENT ON THE PLEADINGS

Federal Rule of Civil Procedure Rule 12(c) states "After the pleadings are closed – but

early enough to not to delay trial - a party may move for judgment on the pleadings."[1]

### B.      SUMMARY JUDGMENT

Summary judgment is appropriate only in circumstances where "the evidence is such that

a reasonable jury could not return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d. 202, 106 S. Ct. 2505 (1986).  In deciding a motion

for summary judgment the district court is obligated to view the available evidence in the light

most favorable to the nonmoving party.  *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 26 L. Ed. 2d

142, 90 S. Ct. 1598 (1970); *Popham, Haik, Schnobrich, Kaufman & Dotty, Ltd. V. Newcomb*

*Securities Co.*, 243 U.S. App. D.C.  43, 751 F.2d 1262, 1263 (D.C. Cir. 1985) ("any doubt is to

be resolved against the moving party").  In *Anderson*, the Supreme Court made clear that "at the

---

[1] As matters outside the Pleadings have been raised before this Court, this instant Motion should be converted to one for Summary Judgment under Fed. R. Civ. P. 56.

summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

The moving party bears the burden of demonstrating the absence of any genuine issue of material facts. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); *Richardson v National Rifle Association,* 871 F. Supp. 499 (D.D.C. 1994). The defendant is thus entitled to summary judgment only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

The Court's threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury **might** return a verdict in his favor. If he does so, there is a genuine issue of fact that requires trial." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (emphasis added).

"The allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff and, if these allegations are sufficient, the case must not be dismissed even if the court doubts that the plaintiff will ultimately prevail." *Wallace,* 1998 D.C.App. LEXIS 9, at *9; *McBryde v. Amoco Oil Co.,* 4040 A.2d 200, 203 (D.C. 1979). In addition, all ambiguities must be resolved in plaintiff's favor. *See Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith v. Beards,* 680 A.2d 419, 430 (D.C. 1996). Given these considerations, "unless it is beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief," a pleading should not be dismissed. *Id.*

Under a Rule 56 analysis, defendant's motion must fail as plaintiff has adequately stated claims upon which relief can be granted.

## IV.    PLAINTIFF'S CLAIMS ARE NOT BARRED BY *RES JUDICATA.*

Fed. R. Civ. P. 60(b) states: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: … (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b):… (6) any other reason that justifies relief."

Fed. R. Civ. P. 60(c)(1) goes on to state: "A motion under Rule 60(b) must be made within a reasonable time- and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding."

Fed. R. Civ. P. 60(d)(1) further states: "This rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding:…"

Plaintiff's prior cause of action was concluded by this Honorable Court on or about May 27, 2005 by and through a denial of Plaintiff's Motion for Reconsideration.

Insofar as additional documents or new evidence, recourse to rule 60(b) is governed (and apparently precluded) by Fed. R. Civ. P. 60's strict timing requirements. There is an ironclad one-year limit on the filing of a rule 60(b) motion based on newly discovered evidence. As such motions must be filed within one year from the date the judgment was entered in the district court, which was in May of 2005, more than two years ago prior to the filing of this instant case. See Goland v. C.I.A., 607 F.2d 339, 372 (C.A.D.C., 1947)

The one-year time limit in rule 60(b) applies only to motions under clauses (1), (2), and (3), covering fraud between the parties, newly discovered facts, and misconduct of a party. In any case, rule 60(b) contains a saving clause which states that the rule "does not limit the power of a

court to entertain an independent action to relieve a party from a judgment, order or proceeding .

. . ." Thus the rule does not extinguish the historical authority of equity courts to reform

judgments in appropriate cases. The one-year limit on certain of the rule 60(b) motions is not

applicable to the independent action, leaving it, apart from collateral attack, as the only manner

of obtaining relief from a judgment in those cases where the 60(b) motion has become time

barred. Goland v. C.I.A., 607 F.2d 339, 372-3 (C.A.D.C., 1947)

The Goland Court stated that " 'the exception for equitable interposition by independent

suit rests on "stringent" rules limited to circumstances "which render it manifestly

unconscionable that a judgment be given effect".' " Although such circumstances may sometimes

appear from evidence disclosed after the judgment, such extraordinary review is not to be

indulged loosely. We have observed: in an independent action seeking relief from a judgment on

the basis of newly-discovered evidence and asking for a new trial the plaintiff must meet the

same substantive requirements as govern a motion for like relief under Rule 60(b): he must show

that the evidence was not and could not by due diligence have been discovered in time to

produce it at trial; that it would not be merely cumulative; and that it would probably lead to a

judgment in his favor." Goland v. C.I.A., 607 F.2d 339, 372-3 (C.A.D.C., 1947); See also Carr v.

District of Columbia, 543 F.2d 917, 926-27 (C.A.D.C., 1976).  In this case, Plaintiff believes that

Defendant's articulated basis for the first case is phony based upon the Defendant's actions of

afterwards placing a Sergeant in the exact position of dog handler Plaintiff was removed from.

In Manhattan Center Studios, Inc. v. N.L.R.B., 452 F.3d 813, footnote 6 (D.C. Cir., 2006)

the Court states "[r]elief under Rule 60(b)(2) requires that the moving party show, among other

requirements, that he was diligent in discovering the new evidence. See Jones v. Lincoln Elec.

Co., 188 F.3d 709, 732-35 (7th Cir.1999)."  Plaintiff's diligence in discovering this evidence is

clear.  He filed this action after discovering that Defendant's gave the dog handler position to a

Sergeant.  As a matter of fact, Sgt. Proctor was the new person in Plaintiff's division at the time

Plaintiff was removed as dog handler.

In Jones v. Lincoln Electric Co, 188 F.3d 709, 732 (7th Cir., 1999) the Court held that the

grant of a new trial on the ground of newly discovered evidence requires proof of the following

five prerequisites:

1.    The evidence was discovered following trial;
2.    Due diligence on the part of the movant to discover the new evidence is
      shown or may be inferred;
3.    The evidence is not merely cumulative or impeaching;
4.    The evidence is material; and
5.    The evidence is such that a new trial would probably produce a new result.

Plaintiff was not able to discover the new evidence in the case as bar until after the trial

Court issued its Summary Judgment Order as the vacancy announcement was not issued until

2006, therefore prong one is satisfied.  Upon discovering the vacancy announcement and the

hiring of a Sergeant for the Plaintiff's position of dog handler Plaintiff filed a Complaint with the

EEO.  Plaintiff could not have discovered the evidence any earlier as the department had not yet

posted the vacancy announcement or hired Sgt. Proctor as the dog handler, therefore prong two

is satisfied.

Prong three and four are satisfied in that the newly discovered evidence is clearly not

impeachment evidence nor is it cumulative of evidence previously presented by the Plaintiff.

Defendant has overtly hired a Sergeant as a dog handler after removing Plaintiff from the

position while stating that a Sergeant can not be a dog handler.  Defendant has done a complete

turn around from the reason proffered to the Court, in Plaintiff's original case, for its reasons in

removing the Plaintiff as the dog handler.  This is new evidence to demonstrate that Defendant's

articulated reason for removing Plaintiff from his position was simply pretext to mask the discrimination he was subjected to.

Prong five is satisfied in that the new evidence is such that a new case would probably produce a new result as Plaintiff now has the evidence necessary to survive past a Summary Judgment Motion. Plaintiff can show that the Defendants reasons for his removal as the dog handler were pretextural and were not based on any departmental policy or procedure regarding the fact that a Sergeant could not be a dog handler. Plaintiff should have the opportunity to present the facts, law, and argument contained within the above captioned case to a jury and the Defendant's should not benefit from their duplicity.

Plaintiff did not learn about the Defendant allowing an employee to serve as both Sergeant and dog handler until well after Plaintiff's first case concluded. The vacancy announcement regarding the position of canine handler was not issued until December 1, 2006 and again in May of 2006.

After Mr. DeSilva was removed as the Handler Sergeant Proctor was given provided a new canine named Sparky. Defendant Fire Department appointed Sergeant Proctor as the Accelerant Canine Detection Handler without advertising the position. Sergeant Proctor, the newly appointed Handler was serving as Sergeant and dog handler despite this Defendant offering in the first case as a basis for removing Plaintiff that he could not be a Sergeant and a dog handler.

After his appointment, the Defendant Fire Department sent Sergeant Proctor for training and certification as an Accelerant Detection Canine Handler where he was paired with Sparky. With Sergeant Proctor as one dog Handler, the Fire Department placed a vacancy announcement for the position of "Fire/Arson Investigator, Armed/Canine Handler". The Fire Department

placed a Vacancy Announcement for the position of "Fire/Arson Investigator, Armed/Canine Handler" with an effective date of December 1, 2006 through expiration date December 15, 2006 wherein it stated under eligibility "Members of the Department below the rank of Sergeant, with (5) years accredited service with DCEMS".  (Exhibit 6).

The Fire Department than placed Mr. Scott Wilson into the position as an Accelerant Detection Canine Handler.   Upon information and belief Mr. Wilson is under the age of 40.

Plaintiff became aware of Defendant's hiring of Sgt. Proctor followed by the hiring of Mr. Wilson as canine handlers beyond the one year limit imposed under Fed. R. Civ. P 60(c), therefore Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) on or about June 12, 2006. (Exhibit 8).   The EEOC issued Plaintiff a Notice of Suit Rights on or about July 30, 2008 and Plaintiff then filed this instant action.   (Exhibit 9).

Plaintiff has not instituted a new cause of action as defined by the doctrine of *res judicata* as Plaintiff is presenting new evidence which, despite diligent search, could not have been discovered during the Plaintiff's prior action as the actions and activities of the Defendant did not occur until after the final decision in Plaintiff's prior case.

In her memorandum opinion Judge Collyer states on page 8-9 that

> "The D.C. Circuit has instructed:  Even if a court suspects that a job applicant 'was victimized by [] poor selection procedures' it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive' *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982).  Once the employer has articulated a non-discriminatory explanation for its action,… the issue is not 'the correctness or desirability of [the] reasons offered … [but] whether the employer honestly believes in the reasons it offers.' *McCoy v. WGN Continental Broad. Co.,* 957 F.2d 368, 373 (7th Cir. 1992); *see also Pignato v. American Trans Air, Inc.,* 14 F.3d 342, 349 (7th Cir. 1994)  ("it is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.  He must show that the explanation given is a phony reason.").  *Fischback v. Dep't of*

14

*Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996)."

In the instant case Plaintiff now has the evidence to show the explanation Defendant DC Fire and EMS gave the court in the fist case was phony. In the prior case the Plaintiff did not have the evidence the court believed necessary to survive summary judgment. In the instant case, Plaintiff can now show that the articulated reason the Defendant's gave for removing him as the dog handler was simply pretextual and phony. In the prior case, the Defendant's articulated that they removed Plaintiff as the dog handler because he could not be a sergeant and a dog handler at the same time. However, the Defendant even now has a sergeant, under the age of 40, as a dog handler and has gone so far as to send the sergeant for training and to be certified with his canine partner and has appointed Mr. Wilson, also under 40, as the dog handler.

As Plaintiff can now produce evidence that Defendant's reasons for his removal as a dog handler were pretextural, Plaintiff must be permitted to go forward with the above captioned action and obtain a true decision on the merits based on the newly discovered evidence.

## V.     DEFENDANTS RECENT ACT OF FILLING THE POSITION OF DOG HANDLER WITH A SERGEANT WAS A SEPARATE ACT OF AGE DISCRIMINATION AGAINT THE PLAINTIFF.

Also, this action lies by itself because when this Defendant recently filled the dog handler's position by placing Sgt. Proctor, a younger, lesser qualified employee, in the position without out offering the same to Plaintiff, Defendant again discriminated against Plaintiff based on his age.

Despite the fact that Plaintiff believes this case can be maintained because it is not barred by Rule 60 or *res judicata*, this act of Defendants of placing Sgt. Proctor in the position of dog handler over Plaintiff has a separate and distinct act of age discrimination in that if a placement was to be made and any consideration of eligible persons at the rank of Sergeant was to be given,

Plaintiff should have been selected over Sgt. Proctor and Defendant's failure to do so was a separate act of age discrimination that serves at the bases of Plaintiff's new discrimination case filed with EEOC. The reference to the first case is significant because of Defendant asserted basis for removing Plaintiff was that he was not able to serve as Sergeant and dog handler. In this new case that defense is unavailable and therefore based on Judge Collyer's analysis in the first case, Plaintiff can articulate that his rank of Sergeant is a phony defense and as such established a prima facie case of age discrimination

## VI.    PROVING DISCRIMINATION AS A MATTER OF LAW

The basic test for presentation of proof and the burden of persuasion in a discrimination case has been laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). First, the plaintiff has the burden of proving by a preponderance of evidence a *prima facie case* of discrimination. Second, if plaintiff has successfully completed step one, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employee's rejection. Finally, the plaintiff is then given an opportunity to prove that the assertions put forth by the defendant in step two were actually a pretext for discrimination. *McDonnell Douglas Corp.,* at 804; *Texas Dep't of Community Affairs,* at 253.

### A.    PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF AGE DISCRIMINATION.

The same standard that is applied to evaluate Title VII claims is used to evaluate ADEA claims. *Brown v. Brody*, 199 F.3d 446, 456 n.10 (D.C. Cir. 1999). Plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).

The first prong of the *prima facie* test for age discrimination is met in that plaintiff is over forty years of age and the less qualified employee who replaced him on the Accelerant Detection Canine Team is younger than plaintiff, and not a member of plaintiff's protected class.

The second prong is satisfied in that plaintiff suffered an adverse employment action. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits". *Burlington Industries, Inc., v.* Ellerth, 524 U.S. 742, 761 (1998). Plaintiff was subject to a significant change in benefits, as a canine handler, plaintiff automatically earned two hours of overtime pay 365 days a year. When plaintiff was ordered to turn Taz over to the younger DeSilva, plaintiff lost that guaranteed overtime pay the same was denied Plaintiff when he was overlooked for the position he held and Defendant placed Sgt. Proctor into the position. Clearly the loss of over approximately 700 hours of overtime pay is an adverse employment action and is a significant change in benefits as stated in *Burlington Industries, Inc,.* Moreover, the then Fire Chief testified that the career path of fire suppression is different than fire prevention. Removing plaintiff from fire prevention and placing him in fire suppression changed his career path. (Exhibit 10, pg. 39, 18-22; 19, 1-22).

The final prong of the test is fulfilled by a simple review of the facts at hand: plaintiff was removed from his position on the Accelerant Detection Canine Team. Plaintiff was a highly trained canine handler with certification from FSI to work with Taz in detecting accelerants at a fire scene. Plaintiff was replaced by several younger individual who admittedly had no experience in working with a trained canine partner in the capacity of an Accelerant Detection Canine Team, one of whom is a Sergeant.

DeSilva was given Taz because he was younger than plaintiff, and defendant wanted younger employees in the division. After DeSilva was removed at the dog handler Sgt. Proctor, who is under 40, was brought in as the dog handler, further Mr. Wilson, also under the age of 40, was brought in as a dog handler.

There are facts from which a jury might conclude that plaintiff was removed from his position and the canine Taz was removed from his care due simply to Plaintiff's age and that Defendant failed to place Plaintiff in the position it placed Sgt. Proctor in because of his age. Therefore, plaintiff has established a *prima facie* case of age discrimination, and will further show that defendant's explanations for it actions were mere pretext.

Based upon the evidence in this case, defendants' argument that plaintiff suffered no adverse action is without merit and must fail and Defendant's Motion for Judgment on the Pleadings should be denied.

### B.  DEFENDANT'S ARTICULATED RESONS FOR ITS ACTIONS WERE OFFERED AS PRETEXT TO MASK THE DISCRIMINATION PLAINTIFF WAS SUBJECTED TO BECAUSE OF HIS AGE.

The reasons offered by defendants for the actions taken were offered as mere pretext to mask the discrimination plaintiff was subjected to due to his age.

Defendant's reason why plaintiff was removed as the canine handler and replaced by DeSilva was that plaintiff's Sergeant's duties suffered and that is why he was removed as a part of the Accelerant Detection Canine team. However, there was no credible evidence presented to support this assertion.

In the instant case Plaintiff can now show that the articulated reason the Defendant's gave for removing him as the dog handler were simply pretextual. In the prior case the Defendant's articulated that they removed Plaintiff as the dog handler because he could not be a sergeant and

a dog handler at the same time.  However, the Defendant today has a sergeant as a dog handler and the Defendant sent Sgt. Proctor for training to be certified with his canine partner, just like Plaintiff was certified.

As Plaintiff can now produce evidence that Defendant's reasons for his removal as a dog handler were pretextural, Plaintiff must be permitted to go forward with the above captioned action and obtain a true decision on the merits based on the newly discovered evidence.

Defendants argued that keeping plaintiff as Sergeant and Dog Handler would violate the Collective Bargaining Agreement.  Defendant's state "it was a violation of policy and the Collective Bargaining Agreement for plaintiff to maintain his technician duties as a dog handler, while holding the rank as Sergeant".

The most persuasive evidence of the fact that there was no policy violation or violation of the Collective Bargaining Agreement is found when you find that defendants used District of Columbia funds and paid for a dog for plaintiff and for plaintiff to go away and become certified with Taz as an Accelerant Detection Canine team; all of this occurred AFTER plaintiff became Sergeant and have now appointed yet another Sergeant to the position.

Moreover, when defendants' issued an Announcement for the position of Canine Handler in August 2001, there was no indication in the Announcement that Sergeant's could not apply (Exhibit 11).  The first time there is any indication that that rank is considered is found in the Announcement for the Canine Handler's position July 4, 2002.  (Exhibit 12).  There is no mention of rank in the announcement issued on May 3, 2006. (Exhibit 7).

Defendants cannot articulate any legitimate, nondiscriminatory reason for removing plaintiff from his position on the Accelerant Detection Canine Team, or for transferring plaintiff off of his career path to fire suppression.   There is evidence from which a jury could conclude

that there was no policy that prevented plaintiff from serving as the Dog Handler after he became Sergeant, the decision to remove the dog was based on plaintiff's age.

Defendant fails to offer any legitimate, nondiscriminatory reason and/or evidence as to why plaintiff was removed from his position on the Accelerant Detection Canine Team and replaced by a less qualified individual who is younger than the plaintiff who was then replaced by a Sergeant who did not have Plaintiff' experience and training in dog handling and accelerant detection and then Defendant appointed Mr. Wilson as a dog handler, who is also under the age of 40, knowing that Plaintiff was better qualified.

C.    **THERE ARE GENUINE ISSUES OF FACT MATERIAL TO THIS CASE THAT ARE IN DISPUTE.**

Plaintiff was removed from his position as canine handler due to his age and was replaced by younger individuals.  Plaintiff's replacement DeSilva, Proctor and Wilson had no experience working with a canine partner.  Plaintiff and Taz were certified by FSI as an Accelerant Detection Canine Team.  Forensic Scientific Investigations de-certified Taz and the plaintiff when they were separated. Plaintiff was responsible for the training, care and maintenance of the canine 24 hours a day.  Plaintiff received guaranteed over time pay as a result of his position as a canine handler.

Plaintiff's removal as the canine handler left the District of Columbia without a certified Accelerant Detection Canine Team.  FSI would not recertify Taz after his separation from the plaintiff as he could no longer reliably perform the duties of the job as he had initially been trained.  Taz was ultimately given away as a house pet.

Plaintiff was a canine handler prior to his promotion to sergeant. Defendants permitted plaintiff to continue training and working as a member of the Accelerant Detection Canine Team even after he was promoted to the rank of sergeant.

Plaintiff's handling of his canine duties did not suffer after he was promoted to sergeant and his duties as a sergeant were fulfilled while he was a canine handler.  Plaintiff was never informed that he was not fulfilling the duties of sergeant.  Plaintiff's police powers were summarily taken away.  Plaintiff was given no advance warning that they were going to transfer Taz to another handler and transfer plaintiff to another sergeant position in another division and hire another Sergeant as a dog handler.

Defendant engaged in actions that were discriminatory based upon plaintiff age, and plaintiff suffered adverse employment actions including loss in pay and career opportunities.

## VII.    CONCLUSION

Based on the foregoing, plaintiff has established a *prima facie* case of age discrimination. Moreover there is evidence of disputed facts that are material to this case.  Finally, the Defendant has failed to establish that the above captioned action has been fully litigated on the merits and as such Defendant is not entitled to judgment as a matter of law.

When all facts asserted in this case are viewed in a light most favorable to plaintiff, Defendant's Motion For Judgment on the Pleadings should be denied.

WHEREFORE, based on the foregoing, plaintiff Harold Lindsey respectfully requests that this Honorable Court deny Defendant District of Columbia's Motion For Judgment On The Pleadings, grant a hearing in this matter, and grant such other and further relief as deemed just and appropriate.

Respectfully submitted,

By:    __/s/_*Donna Williams Rucker*_____

Donna Williams Rucker, Esquire, 446713
DUBOFF & ASSOCIATES, CHARTERED
8401 Colesville Road, Ste. 501
Silver Spring, Maryland 20910
(301) 495-3131 (Office) (301) 587-1872 (Fax)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(Civil Division)**

| | | |
|---|---|---|
| **HAROLD C. LINDSEY,** | ) | |
| **Plaintiff,** | ) | **Civil Case No.: 07-01939 (RBW)** |
| **v.** | ) | |
| **DISTRICT OF COLUMBIA, *et al.*,** | ) | |
| **Defendants.** | ) | |

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

1.   Plaintiff incorporates by reference thereto the facts articulated in the Fact Section contained within the Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant District of Columbia's Motion for Judgment on the Pleadings as if fully stated herein.

Respectfully submitted,

By:   __/s/_ *Donna Williams Rucker*_____
Donna Williams Rucker, Esquire, 446713
DUBOFF & ASSOCIATES, CHARTERED
8401 Colesville Road, Ste. 501
Silver Spring, Maryland 20910
(301) 495-3131   Office
(301) 587-1872   Facsimile

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(Civil Division)**

| | | |
|---|---|---|
| **HAROLD C. LINDSEY,** | ) | |
| **Plaintiff,** | ) | **Civil Case No.: 07-01939 (RBW)** |
| **v.** | ) | |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

**UPON CONSIDERATION** of Plaintiff's Opposition to Defendant District of

Columbia's Motion for Judgment on the Pleadings, the information contained therein, and the

record herein, it is this _____ day of _____, 2008,

**ORDERED**, that Defendant's Motion for Judgment on the Pleadings be and hereby is,

**DENIED.**

**SO ORDERED.**

_____                              _____
Date Entered                                                         Judge U.S. District Court

cc:

Donna Williams Rucker, Esquire – Via Electronic Service
DuBoff & Associates, Chartered
8401 Colesville Road, Suite 501
Silver Spring, Maryland 20910

C. Vaughn Adams, Esq.  – Via Electronic Service
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HAROLD C. LINDSEY** ) | |
| **6622 Mastbrook Drive** ) | |
| **Fort Washington, Maryland 20744** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.:** _____ |
| ) | |
| **DISTRICT OF COLUMBIA,** ) | |
| **Serve: Honorable Adrian Fenty, Mayor** ) | |
| **c/o Tabitha Braxton, Staff Assistant, or** ) | |
| **Gladys Herring, Executive Assistant** ) | |
| **1350 Pennsylvania Avenue N.W.** ) | |
| **Washington, D.C. 20001** ) | |
| ) | |
| **Serve: Office of the Attorney General** ) | |
| **c/o    Darlene Fields, Secretary, or** ) | |
| **Tonia Robinson, Legal Assistant,** ) | |
| **or Gale Rivers, Secretary** ) | |
| **444 4th Street N.W. 6th Floor South** ) | |
| **Washington, D.C. 20001** ) | |
| ) | |
| **and** ) | |
| ) | |
| **CHIEF OF FIRE AND EMERGENCY** ) | |
| **MEDICAL SERVICES - DENNIS L. RUBIN** ) | |
| **District of Columbia Fire & EMS Department** ) | |
| **1932 Vermont Avenue N.W.** ) | |
| **Washington, D.C.  20001** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

COMES NOW the Plaintiff, Harold C. Lindsey, by and through counsel, DUBOFF & ASSOCIATES, CHARTERED and Donna Williams Rucker, Esquire, and sues the Defendant, District of Columbia and Chief of Fire and Emergency Medical Services, Dennis L. Rubin, and in support therefore, states as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction of the Court is proper pursuant to The Age Discrimination in Employee Act of 1967, 29 U.S.C. §§ 621-634 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e) et seq.  Venue is appropriate and based on the fact that the actions complained of are the result of actions and employment practices of Defendant District of Columbia and District of Columbia Fire and Emergency Medical Services Department occurring within the District of Columbia.

2.      The State claims are proper under the theory of Supplemental Jurisdiction. Venue is proper as the events described herein occurred in the District of Columbia.

3.      Plaintiff, Harold C. Lindsey (hereinafter "Lindsey"), timely filed a complaint with the Equal Employment Opportunity Commission. Plaintiff files this civil action timely and in accordance with the authority noted in his Dismissal and Notice of Rights received on or about August 2nd, 2007. (See Exhibit "A").

4.      Plaintiff Lindsey brings this action pursuant to the Age Discrimination in Employment Act for discrimination on the basis of his age (47 years).

## PARTIES

5.      Plaintiff Lindsey is a resident of Prince George's County, in the State of Maryland.

6.      Defendant District of Columbia is a municipal corporation empowered to sue and be sued and is the governmental entity that subjected Lindsay to discrimination.

7.      Upon information and belief Defendant District of Columbia Fire and Emergency Medical Services Department is empowered to sue and be sued and is the entity that subjected Lindsay to discrimination.

2

8.      Defendant Dennis L. Rubin is the Chief of Fire and Emergency medical Services for the District of Columbia and he was aware of and condoned the actions complained of herein.

## FACTS

9.      Plaintiff incorporates by reference thereto the information, facts and/or allegations contained in the preceding paragraphs as if fully set forth herein and further alleges:

10.     Plaintiff Lindsey began working for the Defendant Fire and EMS Department in November of 1979 as a firefighter. In 1989 he was promoted to Inspector, in 1991 he was promoted to Fire Inspector and was subsequently promoted to the rank of Sergeant in January, 2001.

11.     Plaintiff at all relevant times was over the age of 40.

12.     Plaintiff Lindsey had received extensive training in the area of Fire and Arson Investigation. He was nationally certified as an Explosive Fire and Arson Investigator and had testified as an expert in a number of criminal trials.

13.     At the time he was removed as the Handler, Plaintiff Lindsey was the only member of the Defendant Fire Department to be certified to work, in conjunction with his trained dog, as an Accelerant Detection Canine Team, and he was successfully performing his job duties.

14.     Certification as an Accelerant Detection Canine Team required substantial training and work on the part of the Plaintiff Lindsey, and a period of training, and more importantly, bonding with his canine partner.

15.     Individuals are not certified alone; they are certified as part of team that includes the handler and his dog. At the time Plaintiff was removed as the handler no other member of the Defendant Fire Department was trained or certified to work in this field.

3

16.   During the time that Plaintiff was attempting to retain his position as the Handler, Plaintiff Lindsey received no written performance evaluations, however, his immediate superior told him that his work was good.

17.   On or about February 6th, 2001 the Plaintiff was suddenly, and without warning, removed from his position as a Sergeant in the Fire/Arson Investigation Unit.

18.   On or about February 6th, 2001 Plaintiff Lindsey's police powers were revoked, and the Defendant Fire Department confiscated the Accelerant Detection Canine, Taz.

19.   Plaintiff was informed that he could not be a Sergeant as well as the Accelerant Canine Detection Handler.

20.   The Accelerant Canine position and Taz, the certified accelerant canine, were given to Mr. DeSilva.

21.   Upon learning that the canine had been removed from Sergeant Lindsay, FSI, the Company that certified Taz and plaintiff as an Accelerant Canine Detection Team, told the Fire Department, upon learning that Taz had been transferred to DeSilva that Plaintiff and Taz were certified as a team and breaking up the canine and handler would nullify the certification.

22.   FSI further informed the Defendant Fire Department "we would have strongly advised against the splitting of a properly certified scent detection team."

23.   FSI officially de-certified plaintiff and Taz after the Fire Department removed Plaintiff as the Fire Department's canine handler and gave Taz to DeSilva.

24.   Taz's performance dropped, resulting in the dog being given away as a house pet because he was no longer able to perform the functions he had once been trained to perform.

25.   Mr. DeSilva was provided with a new canine named Penny.

26.     The Defendant Fire Department sent Mr. DeSilva for training and certification as an Accelerant Canine Detection Handler.

27.     Upon information and belief Mr. DeSilva was removed from his position as Accelerant Canine Handler in November or December of 2005.

28.     Upon information and belief Penny was decertified.

29.     After Mr. DeSilva was removed as the Handler Sergeant Proctor was given provided a new canine named Sparky.

30.     Defendant Fire Department appointed Sergeant Proctor as the Accelerant Canine Detection Handler without advertising the position.

31.     Sergeant Proctor the newly appointed Handler was a Sergeant in direct contravention of the reasons Plaintiff was removed as the Handler.

32.     After his appointment, the Defendant Fire Department sent Sergeant Proctor for training and certification as an Accelerant Detection Canine Handler where he was paired with Sparky.

33.     With Sergeant Proctor as one dog Handler, the Fire Department placed a vacancy announcement for the position of "Fire/Arson Investigator, Armed/Canine Handler".

34.     The Fire Department placed a Vacancy Announcement for the position of "Fire/Arson Investigator, Armed/Canine Handler" with an effective date of December 1, 2006 through expiration date December 15, 2006 wherein it stated under eligibility "Members of the Department below the rank of Sergeant, with (5) years accredited service with DCEMS".

35.     The Fire Department than placed a white individual, named Mr. Scott Wilson into the position as an Accelerant Detection Canine Handler.

36.     Upon information and belief Mr. Wilson is under the age of 40.

5

## COUNT I
## (AGE DISCRIMINATION)

37.    Plaintiff incorporates by reference thereto the information, facts and/or allegations contained in the preceding paragraphs as if fully set forth herein and further alleges:

38.    The Defendant Fire Department allegedly removed plaintiff from his position as Accelerant Detection Canine Handler, as the Defendant maintained that Plaintiff as the Handler, could not be a Handler as well as a Sergeant.

39.    On numerous occasions in 2000 and 2001, Plaintiff Lindsey, and other members of his unit heard their immediate supervisor, Captain Fleming, make remarks to the effect that he wanted to bring in younger members of the Firefighting Division to replace members of the Fire/Arson Investigative Unit.

40.    Plaintiff was removed from his position even after Forensic and Scientific Investigations, the organization that certifies Accelerant Detection Teams, notified Defendant Fire Department that it strongly advised against the splitting of a properly certified scent detection team.

41.    As a result of the Fire Department's actions, the certifying company decertified the dog and Plaintiff Lindsey, which for a time left the District of Columbia without a properly trained Accelerant Detection Team; the only fire department in the area without such a team.

42.    After Taz was reassigned by the Fire Department to a Mr. DeSilva, the dog's performance dropped dramatically, resulting in the dog being given away as a house pet because he was no good to perform the function it had once been trained to perform.

43.    Plaintiff's position of Accelerant Detection Canine Handler was given to Mr. DeSilva, a younger employee (under 40 yrs.) who had no experience or certification.

44.     Mr. DeSilva was sent for training and certification and was provided a new canine named Penny.

45.     Mr. DeSilva was removed from his position as a Handler and the canine named Penny was decertified.

46.     When Mr. DeSilva was removed as a Handler the Defendant Fire Department appointed Sergeant Proctor to the position, sent him for training and certification with a new canine named Sparky.

47.     Upon information and belief Sergeant Proctor is under the age of 40.

48.     During the time that Plaintiff worked as part of the Accelerant Detection Team, he received no complaints about his performance or the dog's performance.   Actually, there were several letters of commendation as to the team's work, including letters from the United States Attorney's Office.

49.     Plaintiff Lindsey was told that his employer, the D.C. Fire Department felt that it was too burdensome for a supervisory official, a Sergeant, to handle both supervisory duties and Accelerant Detection duties.

50.     Plaintiff was, however, a Sergeant before he was selected by the D.C. Fire Department, trained and certified as a dog handler.

51.     Plaintiff Lindsey advised the D.C. Fire Department that he would give up his rank of Sergeant in order to remain part of the Accelerant Detection Team, so that he could continue to serve the needs of the citizens of the District of Columbia.

52.     Defendant refused to allow Plaintiff to give up his rank, and even recommended punitive measures to teach Plaintiff a lesson for making such a request.

53.     In a memorandum dated January 18, 2001, Battalion Fire Chief James N. Short, recommended denial of Plaintiff 's request to forego his rank and stay apart of the Accelerant Detection Team.

54.     With Sergeant Proctor and Sparky as one Accelerant Detection Canine team, the Fire Department placed a Vacancy Announcement for the position of "Fire/Arson Investigator, Armed/Canine Handler" with an effective date of December 1, 2006 through expiration date December 15, 2006.

55.     In the vacancy announcement under eligibility it states "Members of the Department below the rank of Sergeant, with (5) years accredited service with DCEMS".

56.     Subsequent to the vacancy announcement the Fire Department placed an individual, who is younger than the Plaintiff, into the position as Accelerant Canine Handler, named Scott Wilson.

57.     The Defendant Fire Department sent Mr. Wilson to be trained and certified and teamed with another canine named Rue.

58.     When Sergeant Proctor was placed in the position of Accelerant Detection Canine Handler, while still a Sergeant was in direct contravention of what the Department stated.

59.     Upon information and belief Mr. Wilson is under the age of 40.

60.     Plaintiff Lindsey was removed from his position, and had his dog confiscated and assigned to another younger employee, based solely upon his age (over 40 yrs.).  Plaintiff suffered many adverse employment actions as a direct result of Defendant's discriminatory treatment.

61.     Proctor one of the two current Accelerant Canine Detection Handlers is a Sergeant as well as a Handler.

62.     Plaintiff has suffered a great amount of humiliation, embarrassment, mental anguish and pain and suffering as a direct result of Defendant's actions.

63.     Plaintiff has lost a substantial amount or wags as a result of the D.C. Fire Department's decision to remove him from his position and confiscate and reassign his dog to another younger employee who is also a Sergeant.

64.     Plaintiff has lost a substantial amount or wags as a result of the D.C. Fire Department's decision to prevent him from applying for the position of Handler when the vacancy announcement was posted.

**WHEREFORE**, Plaintiff respectfully prays this Honorable Court:

1.      Award compensatory damages in the amount of Seven Hundred Fifty Thousand Dollars ($750,000.00) with pre and post judgment interest;

2.      Attorney's fees and costs;

3.      Punitive damages;

4.      Declaratory and injunctive relief concerning the illegal nature of the policies and practices complained of herein; and

5.      Such other and further relief as the Court may deem just, necessary and proper.

## COUNT II
### (NEGLIGENCE)

65.     Plaintiff incorporates by reference thereto the information, facts and/or allegations contained in the preceding paragraphs as if fully set forth herein and further alleges:

66.     Defendant owed plaintiff a duty of care to abide by the rules, regulations, procedures and laws then in effect within the District of Columbia Fire and EMS Department and in the District of Columbia.

67.     Defendant breached the duty of care owed to plaintiff by violating plaintiff rights and failing to abide by the law rules regulations and procedure then in effect in the District of Columbia and the District of Columbia Fire and EMS Department.

68.     As a direct and proximate result of the breach, and without plaintiff in any way contributing thereto, plaintiff has suffered, and will continue to suffer, great emotional distress, pain, suffering and humiliation.  Plaintiff has also incurred substantial amount of lost wages, and other costs and expenses.

**WHEREFORE**, Plaintiff respectfully prays this Honorable Court:

1.     Award compensatory damages in the amount of Seven Hundred Fifty Thousand Dollars ($750,000.00) with pre and post judgment interest;

4.     Attorney's fees and costs;

5.     Punitive damages;

4.     Declaratory and injunctive relief concerning the illegal nature of the policies and practices complained of herein; and

5.     Such other and further relief as the Court may deem just, necessary and proper.

## COUNT III
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

69.     Plaintiff incorporates by reference thereto the information, facts and/or allegations contained in the preceding paragraphs as if fully set forth herein and further alleges:

70.     Plaintiff has suffered a great amount of humiliation, embarrassment, mental anguish and pain and suffering as a direct result of Defendants' actions by and through its employees, servants and/or agents.

71.     Defendants' actions were intentional and caused Plaintiff an extreme amount of emotional distress, embarrassment and humiliation.

72.     Plaintiff has been embarrassed in front of his peers, family, supervisors, and friends by the acts of the Defendants in removing Plaintiff from his position as Accelerant Detection Canine Handler simply because of his age.

73.     Plaintiff has been caused to suffer emotional anguish, and psychological distress in conjunction with the Defendants' actions in removing him from his post as a Handler and placing an individual younger than the Plaintiff is the position of Canine Handler and preventing Plaintiff from applying for the position of Handler when the vacancy announcement was posted.

74.     Defendant, by and through the actions of its employees, agents, and/or servants carried out their actions against Plaintiff with malice and with the intent to place the plaintiff in the most embarrassing and humiliating circumstance they could create. Defendant's actions were deliberate and egregious.

75.     The Defendant District is responsible for the intentional acts or omissions of its agents, servants and/or employees under the doctrine of *Respondeat Superior*.

76.     The Defendant Fire Department is responsible for the intentional acts or omissions of its agents, servants and/or employees under the doctrine of *Respondeat Superior*.

77.     Plaintiff was subjected to these actions of Defendant by and through, it employees, agents, and/or employees, through no fault or actions of his own.

**WHEREFORE**, Plaintiff respectfully prays this Honorable Court:

1.     Award compensatory damages in the amount of Seven Hundred Fifty Thousand Dollars ($750,000,.00) with pre and post judgment interest;

2.     Attorney's fees and costs;

11

3.      Punitive damages,

4.       Declaratory and injunctive relief concerning the illegal nature of the

policies and practices complained of herein; and

5.      Such other and further relief as the Court may deem just, necessary and

proper.

Respectfully submitted,


By:      __/s/ *Donna Williams Rucker* _____
         Donna Williams Rucker, Esquire, #446713
         DuBoff & Associates, Chartered
         8401 Colesville Road, Suite 501
         Silver Spring, Maryland 20910
         (301) 495-3131     Office
         (301) 587-1872     Facsimile


## JURY DEMAND

Plaintiff requests a trial by jury on all issues contained herein.


__/s/ *Donna Williams Rucker* _____
Donna Williams Rucker, Esquire

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT COLUMBIA

```
- - - - - - - - - - - - - - -x
                               :
HAROLD LINDSEY,                :
                               :
         Plaintiff,            :
                               :   Civil Action No.
     v.                        :   1:02cv1592(RMC)
                               :
DISTRICT OF COLUMBIA,          :
                               :
         Defendant.            :
                               :
- - - - - - - - - - - - - - -x
```

Washington, D.C.
Friday, January 30, 2004

The deposition of HAROLD LINDSEY, called for

examination by counsel for Defendant in the

above-entitled matter, pursuant to notice, in the

offices of Corporation Counsel, 441 Fourth Street,

Northwest, Sixth Floor, Washington, D.C., convened

at 3:20 p.m., before Sandy Medford Nelson, a notary

public in and for the District of Columbia, when

were present on behalf of the parties:

9

1    present--well, 1979 until you are--you begin your

2    dog handling duties, canine handling duties.

3        A    1979, came into the fire department.  Was

4    assigned to Engine 24 for probation.  From there, I

5    went to truck 12.  From truck 12, I transferred to

6    truck one.  In 1980, I came to the Fire Marshal's

7    office as an Inspector.

8            While an Inspector, I did plans review for

9    extended time over there in conjunction with code

10   enforcement, new construction, public assembly.  In

11   1983, I believe, I went into the Arson

12   Investigation Unit.  In 1983, I also had the

13   opportunity to acquire a canine.

14       Q    Okay.  And when you speak of the

15   opportunity to acquire the canine, was that--how

16   did that happen?  Was there a job announcement?

17       A    At that particular time, ATF and the State

18   of Connecticut--Connecticut state troopers had put

19   together an arson accelerant detection program.  I

20   believe I was the first one in the class or the

21   second class.

22            It was offered to the Investigators within

1    A    Correct.

2    Q    Okay.  At what point after taking the

3 third exam--as I believe you said in 1998--did you

4 receive notice that you were actually going to be

5 promoted?

6    A    I don't understand.

7    Q    Okay.  Well, you take the exam in 1999,

8 correct?

9    A    Correct.

10    Q    Okay.  You got the results back at a

11 certain point.  I'm just wondering when you were

12 notified that you were actually going to be

13 promoted.

14    A    That would have to be January 2000.

15    Q    Okay, okay.  What, if any, conversations

16 did you have with anybody in your supervisory chain

17 of command with respect to what your job duties

18 would be after you got promoted to Sergeant?

19    A    Well, I was approached by Chief Short and

20 Lieutenant Fleming.

21    Q    Was Lieutenant Fleming, as you are

22 referring to him, still a Lieutenant at that point?

62

1    for overtime compensation differs significantly

2    from your opportunity for overtime compensation

3    currently?

4          MS. RUCKER:  Objection as to form.

5    Doesn't indicate early versus what.

6          BY MR. SWINSON:

7      Q    Currently, in your current capacity as,

8    you know, here, you know, in January 2004 versus

9    prior to being promoted to Sergeant.

10     A    Just repeat the whole question.  I'm

11   sorry.

12     Q    Sure.  I'm wondering if there's any

13   significant difference in your opportunity to be

14   compensated for overtime in your present job with

15   the fire department versus before--versus your job

16   as a canine handler prior to being promoted to

17   Sergeant.

18     A    Yes.

19     Q    Okay.  And how would you describe that?

20     A    Well--

21          MS. RUCKER:  Objection as to form.  You

22   can answer.

65

1    so many things.  It wasn't like the Firefighting

2    Division where you have thousands of people.  An

3    opportunity of overtime comes far and in between in

4    many areas.

5          But in fire investigation, if I wanted to

6    cover somebody's shift, that was a possibility.  If

7    another jurisdiction asked for the canine, that was

8    a positive possibility.  If the Investigators asked

9    for some assistance--whether it be the canine or

10   just the fact of we need some manpower.  We had a

11   fatality.  I need you to come in and take pictures.

12   I need you to interview some witnesses--that was

13   another possibility.  So, there were several

14   different areas of possibility of overtime.

15       Q    Okay.  Over and above the two hours per

16   day?

17       A    Yes.

18       Q    Okay.  Once you left the Investigation

19   Unit as a Sergeant, what was your next duty

20   station?

21          MS. RUCKER:  Objection as to form of the

22   question.  You can answer.

88

1     Q    Okay.  And at what point after being

2   offered that opportunity did you begin training to

3   be a Dog Handler, canine handler?

4     A    I assumed once the paperwork was in I went

5   to training.

6     Q    Okay.  At what point would you consider

7   yourself a canine handler or did you consider

8   yourself a canine handler as opposed to what you

9   had been immediately before?

10         MS. RUCKER:  Objection as to the form of

11   the question.

12         THE WITNESS:  After receiving training and

13   certification.

14         BY MR. SWINSON:

15     Q    Okay.  About how long did that take, the

16   certifying process?

17     A    Three weeks.

18     Q    Three weeks and you were certified?

19     A    Three weeks, approximately three weeks.

20     Q    Okay.

21     A    I received certification.

22     Q    Okay.  Was there another canine handler

89

1    available to the Department in those intervening

2    three weeks?

3        A    No.

4        Q    Okay.  Did you consider yourself competent

5    to handle the canine for the purposes you would

6    ultimately handle the canine prior to the training?

7            MS. RUCKER:  Objection to the form of the

8    question.  You're asking him did he consider

9    himself certified before he got certified?

10           BY MR. SWINSON:

11       Q    Do you have an answer, Sergeant Lindsey?

12       A    Can you repeat the question?

13       Q    Right.  I'm wondering if prior to

14   receiving the certification that you spoke of just

15   now--prior to that, but after the decision to take

16   the offer--did you feel competent to utilize the

17   canine for purposes you would ultimately use the

18   canine for your job.

19           MS. RUCKER:  Objection as to form.  You

20   can answer.

21           THE WITNESS:  After I received the

22   training did I feel--

114

1   you were a Sergeant and a Dog Handler; is that

2   correct?

3       A    That is correct.

4       Q    Okay.  Were you told by either Fire

5   Marshal Thompson or Fleming about any performance

6   problems you had with your job?  Were you told

7   about my kind of performance problems at all?

8       A    No, I wasn't.

9       Q    Okay.  You were asked about whether or not

10  there had been any complaints that were made

11  against you, and I asked whether or not the--if

12  anyone, at any given point, told you that there

13  were any complaints unrelated to performance

14  problems that had been made against you.

15      A    No.

16      Q    Okay.  You were asked whether or not there

17  were any other canine handlers available while you

18  were doing training when you first were going to

19  become a canine handler.  Do you recall that?

20      A    Yes, I do.

21      Q    Do you know whether or not in the absence

22  of a canine handler the District of Columbia had

115

```
 1   the ability to get another county to assist them?
 2   Do they the ability to ask another county to assist
 3   them if a canine for the District is not available?
 4        A    Right now or before?
 5        Q    When you were operating as the canine
 6   handler.
 7        A    There was no other--for the most part,
 8   there was no other jurisdiction that had a canine,
 9   not until maybe three years after I acquired the
10   first canine in the area.
11        Q    Did there come a time where the District
12   had to ask for another canine to cover during the
13   time you were operating as a Dog Handler?
14        A    Yes.
15        Q    And was that county available?
16        A    Sometimes.
17        Q    Were there ever times when the county was
18   not available to provide assistance to the
19   District?
20        A    Yes, there were times like that.
21        Q    So, in that instance, if the District
22   didn't have a canine handler and another
```

117

1    Plaintiff's claims here with allowing Plaintiff's

2    counsel to proceed with her questioning.

3            MS. RUCKER:  Very good.

4            BY MS. RUCKER:

5    Q    The question is, you became Sergeant is

6    what year?

7    A    2000.

8    Q    Okay.  And did the District spend money

9    for you to become certified as a canine handler

10   with the dog Taz after you became a Sergeant?

11   A    Yes.

12   Q    And at the time that this was done, had

13   anyone come to you to tell you that in doing so

14   there may be some question or concern about your

15   ability to perform the Sergeant duties that you

16   were already under at the time they sent you for

17   certification with the dog?

18   A    No.

19   Q    You were also read a portion of your

20   complaint with respect to whether or not you had

21   ever been instructed that there was some kind of

22   conflict or inability to do your duties as Sergeant

125

1    any--let me rephrase it.

2           Did any supervisor come to you regarding

3    any one of those things that you listed for

4    Corporation Counsel to tell you that you were

5    performing deficiently in any of those things?

6    A    No.  As a matter of fact, the opposite.

7    They told me I was performing greatly compared to

8    the last person that was in that slot.

9    Q    And do you know about the timeframe in

10   which you were told this?

11   A    That was probably about three, four weeks

12   after I got down to the office.

13   Q    Okay.  You were asked a specific amount of

14   questions concerning your working with the

15   particular dog Taz, and you have--with your

16   training and certification--the ability to speak as

17   an expert on the subject of being a canine handler;

18   is that correct?

19   A    That's correct.

20   Q    You testified as an expert at hearings and

21   trials within the District of Columbia; is that

22   correct?

126

```
1      A    That's correct.

2      Q    And, at any given point, did you have any

3  belief that there was some action that you were not

4  taking that affected the K-9's ability to either be

5  effect or to perform properly as trained for?

6      A    None at all.

7      Q    Did you ever perceive anything in the

8  dog's duties or ability to respond that sent any

9  kind of signal to you that there was some kind of

10  problem with the dog being able to perform?

11      A    No, there wasn't.

12      Q    Now, did any person, including then

13  Captain Fleming and Fire Marshal Thompson, ever

14  come to you and say that they had perceived

15  anything that was in any way deficient in terms of

16  how the dog was being handled?

17      A    No, they didn't.

18          MS. RUCKER:  Okay.  I don't have anything

19  further.

20          MR. SWINSON:  I don't have anything

21  either.

22          MS. RUCKER:  You have an opportunity to
```

Forensic
Scientific
Investigations

1390 Hwy 83
Vincent, AL 35178
(205) 672-8880
(205) 672-8885 Fax

February 25, 2001

Office of Fire Chief
Fire & EMS Department
1923 Vermont Avenue
North West Washington D.C 20001

Attn: Chief Ronnie Few

Re: Accelerant Detection Canine Taz

Dear Chief Few;

As is our custom after training and placing a new scent detection canine team, we recently contacted Sgt. Harold Lindsey to monitor job performance with his new Accelerant Detection Canine, "Taz". His description of Taz's performance was "great", to borrow his word. During the conversation, Sgt. Lindsey also related some very distressing news; he said that Taz had been taken from him. He did not know where the dog was or who was caring for it. FSI personnel were not consulted about this. No explanation has been offered, nor has FSI been notified of the dog's whereabouts or its welfare. Had we been contacted in this matter, we would have strongly advised against the splitting of a properly certified scent detection team.

There are several issues of great concern surrounding this situation. These issues have the potential to negative affect both the fire department and FSI. First, we show no record of having trained or certified any other handler with your department. Since our certification is issued for the team and not for an individual, we have no alternative but to de-certify both Harold and Taz. Please consider this letter as official notification of that de-certification. In addition, and of even more concern, we have no way of knowing whether Taz is being properly trained and cared for as we taught during the certification

process. An important part of what Sgt Lindsey learned at our training class was proper feeding and health maintenance techniques, including first aid. Without proper daily conditioning, Taz's performance will degrade rapidly. Furthermore, since we cannot be assured of the canine's proper training and care by an FSI certified handler, FSI cannot and will not assume responsibility in any manner for the dog or his performance.

Another important aspect of FSI's training and placement is to match handlers and canines based on personality profiles. Sgt. Lindsey and Taz were evaluated and matched based on company guidelines developed over many years of experience with dogs and handlers and how they interact. This important part of the training and certification process has been nullified by Taz's removal from his certified handler.

You should also be aware that as long as Sgt Lindsey and Taz worked as a team they were a *"Properly trained and validated ignitable liquid detection canine/handler team......"* NFPA 921, 1998 Edition, Section 9-5.3.4* Canine Teams. With the team split, they are not in conformance with this section of 921. Any evidence collected by a non-certified team would also not be in conformance with NFPA 921.

You may not be aware of the fact that FSI significantly discounted Taz and Sgt. Lindsey's training package to your department because of Sgt Lindsey's considerable previous experience as a canine handler. Even with his considerable experience, however, Sgt Lindsey spent an intensive ten days at our Tampa facility learning FSI's unique approach to handling and conditioning a scent canine. This time was the culmination of a 600-hour training period for Taz. This training and the proper, continuous application of skills developed and methods learned are essential to a scent detection team's performance. Many years of experience in training and placing scent

canines has gone into the design of these programs and the principals taught to both handler and canine.

Even with ten days of training, it is not possible to address all issues and hurdles that will face a new canine scent team.    Therefore, all handlers who successfully complete FSI's canine training course are encouraged to regularly communicate with FSI staff and discuss any problems or issues related to the dog or the handler's performance. FSI cannot train handlers over the telephone and could not extend this service to a handler who has not attended and successfully completed our program.

In closing, we respectfully ask that you re-consider splitting this team.    We consider Taz and Sgt Lindsey; along with all the teams we have trained over the years, to be representatives of our organization as they perform their important work.    Their performance is a direct reflection on our firm and it is without question in FSI's best interest that Sgt. Lindsey and Taz maintain a high level of excellence in their job performance.    As long as Sgt Lindsey and Taz are a team, FSI staff and trainers will be available for any needed assistance and guidance to aid them in that endeavor.

Sincerely,

David Latimer, President

DL/kf

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT COLUMBIA

```
- - - - - - - - - - - - - - -x
                              :
HAROLD LINDSEY,               :
                              :
        Plaintiff,            :
                              :  Civil Action No.
     v.                       :  1:02cv1592(RMC)
                              :
DISTRICT OF COLUMBIA,         :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - -x
```

Washington, D.C.
Thursday, January 29, 2004

The deposition of SIDNEY DESILVA, called for

examination by counsel for Plaintiff in the

above-entitled matter, pursuant to notice, in the

offices of Corporation Counsel, 441 Fourth Street,

Northwest, Sixth Floor, Washington, D.C., convened

at 2:30 p.m., before Sandy Medford Nelson, a notary

public in and for the District of Columbia, when

were present on behalf of the parties:

26

1      A    I received the dog in February.

2      Q    Of?

3      A    2000.

4      Q    2000?

5      A    (Nodding.)

6      Q    Okay.  And who gave you the dog?

7      A    Sergeant Lindsey.

8      Q    And that transfer occurred--the dog being

9    turned over to you occurred at what location?

10      A    At the Fire Marshal's office.

11      Q    All right.  And that dog you're referring

12    to that you received, is that dog's named Taz?

13      A    That's correct.

14      Q    And at the time that you received Taz, had

15    you been trained in terms of working with Taz?

16      A    No.

17      Q    Okay.  How soon after you received Taz did

18    you get training for working with Taz?

19      A    About three or four weeks.

20      Q    And where did you get the training that

21    you received three or four weeks later?

22      A    Clearwater, Florida.

Aug 11 03 03:10p    HAROLD LINDSEY.                301-567-3803                    P.2

**Forensic
Scientific
Investigations**



3390 Hwy 83
Vincent, AL 35178
(205) 672-8880
(205) 672-8366 Fax

April 16, 2002

D.C. Fire and Emergency Medical Rescue Service Department
Office of the Fire Marshal
█████████████████████████████
████████████
Washington, D.C. 20010

Attn:  Assistant Chief, Bruce Cowan

Re:  Accelerant Detection Canine "Taz"

Dear Chief Cowan;

At your request, I conducted an evaluation of the accelerant detection canine,
"Taz". Taz was received at our facility on Friday, April 5th, 2002 and an evaluation was
conducted that evening. As a part of the evaluation, I asked for the canine's training log.
Captain Richard Fleming had previously faxed what he described as representative
sections of Taz's training log to my office on March 28, 2002. Taz was tested to
determine his ability to effectively search for and alert to the odor and identify the
location of liquid accelerants. The training log was evaluated for evidence of its having
been properly kept and accurately representing the canine's daily work and conditioning.

The following conditions and substances were used in evaluating Taz:

1.  The target odors used for the evaluation were petroleum based, ignitable
    liquids.

2.  The testing consisted of working a "scent wheel" and of placing hides of the
    target odors on floors and walls. The hides were confined to the floor and
    within approximately 18" above floor level.

3.  The scent wheel had five unused, epoxy lined, one quart, steel cans one of
    which contained a small drop of the target odor. The other cans were empty

D.C. Fire Department – Page 2 of 4

or had materials commonly encountered at fires scenes, but no contamination of liquid accelerants. The cans were tested with another accelerant detection canine to confirm that only one can contained the odor of an accelerant.

4. The test procedure was to give Taz the command "Seek" and the associated proper hand signal and allow him the opportunity to respond by searching for the odor on either the wheel or to locate a hide. The verbal command and hand signal were the same as those used during Taz's original training.

5. The procedure was repeated several times over the following two days and remedial training and corrections were applied as deemed appropriate to solicit Taz's optimum performance.

The following reflects my opinions formed as a result of the evaluation:

1. Taz at first appeared to focus attention on indicated areas and sniff when given the "Seek" command as if diligently attempting to locate a scent cone. However, he would pass by the target odors without appearing to register their presence in any manner. No secondary alerts or other change in mannerism or body language was noted when he neared placed hides and should have been within the scent cone formed by a hide.

2. After several sessions of remedial training and correction, Taz did begin working the scent wheel fairly effectively, about 95 to 100% accurately during the latter part of the second day.

3. Taz did not at any point during the evaluation conduct an effective or proper search for hides.

4. Taz alerted several times during the evaluation period to locations containing no target odors and that were well away from any scent cone possibly formed by a hide. This behavior offers evidence that Taz has probably become dependent on some subconscious cue from his handler as to where a hide is, (or at least where the handler thinks the canine should alert)) rather than effectively using his olfactory sense to locate a scent cone and follow it to its source. This type of behavior is common in scent dogs that are not worked properly or diligently.

5.  Taz did not respond properly to the "Show Me" command until after several sessions of remedial training.  He appeared somewhat confused when given this command and made no real attempt to re-locate the source of the target odor and point directly at it with his nose properly.

6.  The evaluation of Taz's training log revealed no realistic data pertinent to evaluating his daily work regimen.  The log sheets received were for the months of April and November of 2001 and February of 2002 and were represented to me as being the same as all other months.  The log reflected no variation in method or description of the canine's response, no variation in the time of day of the training sessions or description of hide placement.  No entries showed that Taz has worked a "burned matrix" regularly in compliance with FSI policy.  As stated in my letter to Captain Fleming, this log should accurately, but briefly, reflect the daily training and conditioning exercises performed by the handler.  It should also contain information about fires worked by the team, samples taken and the laboratory analysis reports associated with the analysis of such samples.  I have included a copy of the letter sent to Captain Fleming and the excerpts from one of my training logs for your information.  Also included is a copy of training log sheets faxed to me on March 28.

In order to return Taz to service as an ADC (Accelerant Detection Canine), a minimum of approximately four to six weeks of training would be required.  He would in essence, have to be retrained.  I cannot, however offer any guarantee or assurance that Taz will respond properly within this period or that he would subsequently return to service as an ADC.  In my opinion there is a distinct possibility that Taz will never again be totally dependable as an accelerant detection canine.

*WASTE OF TAX PA MONIE*

I recommend that you consider replacing Taz with a more reliable, properly trained and conditioned canine.  I would also recommend that the following be considered to help prevent the recurrence of this situation:

D.C. Fire Department – Page 4 of 4

1. Establish a procedure where the ADC team submits completed training logs to supervisory personnel for review monthly.

2. Have supervisory personnel conduct structured, quarterly performance evaluations of the ADC team.

In summary Taz's behavior during the subject evaluation offered no evidence that Taz has been worked and handled in accordance with FSI recommended training and conditioning procedures. The training log likewise, offers no such evidence. The only reasonable conclusion that can be drawn from this evaluation is that Taz has not, for a substantial period of time, been properly handled and/or worked in a manner necessary for an ADC team to maintain an acceptable level of accuracy and performance.

Sincerely,

David Latimer
DL/kf



# MEMORANDUM



| Series | Number | Originating Unit | Effective Date | Expiration Date |
|---|---|---|---|---|
| 2005 | 251 | OFC | December 1, 2006 | December 15, 2006 |

**Subject:**

## Vacancy Announcement for Fire/Arson Investigator, Armed / Canine Handler

A vacancy exists in the Fire/Arson Investigation Unit for the position of Canine Handler.

Selection for the vacancy shall be based on requirements included in this announcement.

1.  **Eligibility:**

    Members of the Department below the rank of Sergeant, with (5) years accredited service with DCFF&S.

2.  **Written Application:**

    To be considered for the position, members shall make written application in the form of a Special Report through their chain of command, to the Fire Marshal, Fire Prevention Division. The written application (Special Report) shall include length of service in the Department, and any special qualifications or related experience, which would indicate the applicant's suitability for the position. The applicant shall also submit a F&EMSD Form 118.4, listing any educational training relevant to the position. All written applications are due to the Fire Marshal, Fire Prevention Division, by close of business on **December 15, 2006.**

3.  **Written Recommendations:**

    Upon receipt of a member's written application for the position of Fire/Arson Investigator, Armed Canine Handler, the member's Section Officer, or Platoon Commander, *and* either the Operations Captain or the Company Commander of that applicant, shall make a written recommendation in the form of an endorsement to the member's application. It is the *applicant's* responsibility to see that the above endorsements are completed, and that the application is submitted by the deadline. The absence of the regular company officer/supervisor shall not delay the submission of the application. A copy of the Special Report shall be forwarded through the chain of command by the company officer/supervisor to the appropriate Deputy Fire Chief for the member's personnel file.

    The recommendation of the company officer/supervisor shall include the following:

    a.  Applicant's performance with respect to his/her section level or company level responsibilities and duties.

    b.  Applicant's knowledge of and adherence to departmental rules, regulations, orders, and policies.

F.D. Form 9.1
1995

    c.  Applicant's ability to work effectively with superior officers and fellow members.

4.    **Selection of Candidate:**

    a.  Complete at least five (5) years of satisfactory service in the department.

    b.  Apply for the position in writing, listing any related experience, if any.

    c.  Submit F&EMSD Form 118.4 for any relevant educational experience.

    d.  Submit to an oral interview board selected by the Fire Marshal. This board shall include the Battalion Fire Chief of Fire Prevention Division, a section officer within the Fire Prevention Division of the Rank of Lieutenant or higher, a Fire/Arson Investigator chosen by the Fire Marshal and a member of the bargaining unit, D.C. Firefighters Local 36.

    e.  Applicants shall read Bulletins 35, 36, 73 and 83 of the Bulletin Book, Articles III, V, VII, XV, XVII, XVIII and XXI of The Order Book, and Chapter 2 of NFPA 921 [which will be provided to applicants].

    f.  Submit to and pass a physical examination, drug screen and psychological evaluation. Drug screening will be in accordance with the FEMS Department Substance Abuse Policy.

    g.  Successfully pass a Physical Efficiency Battery [PEB] test (handbook for standards will be provided to applicants).

    h.  Must be in a full duty status, with no restrictions as to type of duty to be performed, at the time of the application.

    i.  Applicants must submit to a full background investigation conducted through the Metropolitan Police Department (MPD), the Federal Bureau of Investigation (FBI), and/or the Bureau of Alcohol, Tobacco, Explosives and Firearms (ATEF). Any applicant not completing the background investigation process shall be immediately disqualified from the application process. Applicant shall sign acknowledgement of said statement. If the background check reveals convictions or arrests not previously reported to the Department, the member shall be subject to disciplinary proceedings, up to and including termination.

    j.  Must undergo training in fire investigations, fire inspections, and/or other related training as required.

    k.  Candidates shall be required to complete all phases of training after initial selection as a candidate. During the training period the candidate shall be required to study the material listed below as well as any other required material:

        •  NFPA 921,
        •  International Fire Code,
        •  D.C. Fire Prevention Code,
        •  District of Columbia Criminal Law and Procedure

l. Candidates will be tested on material and be required to maintain a passing grade of 75% or greater as required by the Fire Marshal.

m. Candidates shall be required to attend and pass all phases of law enforcement training at the MPD Institute for Police Science [IPS] or other law enforcement training program, including but not limited to, meeting physical fitness standards required by that training program in effect at the time the candidate enters the program. Members are required to adhere to the policies and procedures of the law enforcement agency providing that training until the completion of all training.

n. The Fire Marshal, and Fire/Arson Investigators, Armed, as designated in writing by the Fire Chief, shall have and exercise and are hereby vested with the same general police powers including arrest powers, as regular members of the Metropolitan Police Department for the express purpose of enforcing the arson and fire safety laws in effect in the District of Columbia, according to D.C. Official Code § 5-417.01. This power shall extend to any arrest, the securing of warrants pursuant to Chapter 5 of title 23 of the D.C. Official Code, or other lawful action necessary to permit the peaceful completion of any lawful action by the Fire Department; provided that the Fire Marshal and other designated arson investigators have successfully completed a course in the safe handling of firearms, and the use of deadly force, and each person shall be qualified to use a firearm according to standards applicable to officers of the Metropolitan Police Department. The employee may not carry a firearm in the course of official duties unless designated by the Fire Chief in writing as having the authority to carry a firearm.

Candidate will be removed from consideration for the position at any phase not successfully completed and reassigned to their previous assignment.

5. Training:

Attend the PD Training Academy or any other acceptable law enforcement training program as determined by the Fire Marshal.

Attend Accelerant Detection Canine Training program selected by the Department.

Candidates shall perform on-the-job training as required. Candidates shall be required to attend any other training as identified by the Fire Marshal.

6. Position Description:

The Fire/Arson Investigator, Armed/Canine Handler, works under the direction of the Fire Marshal and the officers assigned to the Fire/Arson Investigation Unit, and the Fire Prevention Division, Fire/Arson Investigator. The Armed/Canine Handler is responsible for the investigation of fires that occur within the District of Columbia, and other property for which the District of Columbia may be responsible. Upon completion of the law enforcement training requirements of this position, Investigator, Armed/Canine Handlers are granted the power of arrest, search and seizure, and shall be required to perform these duties when necessary. Members are required to be

armed and have law enforcement authority to carry out the above duties. Fire/Arson Investigators may also be required to cite fire code violations as necessary and participate in special details related to the duties of the Office of the Fire Marshal.

7. **Example of Duties:**

- Respond to fire incidents as needed while on and off duty.
- Work rotating shifts.
- Work in inclement weather.
- Work weekends and holidays.
- Prepare reports and diagrams in a timely and correct manner as per set guidelines.
- Stand, bend, and kneel for prolonged periods of time.
- Collect evidence and take photographs.
- Work closely with other agencies as a representative of the D.C. Fire & EMS Department.
- Make arrests and perform other police actions such as serving warrants.
- Testify in criminal and civil cases
- Cite fire code violations.
- Perform security details.
- Attend training classes and/or participate in special events or details.
- Maintain such qualifications as required of the position

**The Canine Handler shall:**

- Be committed to maintaining and training the canine 7 days a week.
- Be able to lift the canine if necessary .
- Not be involved in any outside employment which conflicts with his/her duties as the canine handler.
- Agree to maintain the canine inside the home. At no time must the canine be allowed to live outside.
- Agree to take the canine as a pet, and accept responsibility for the care and expense of the canine, after it is retired.
- Inform the Fire Marshal of any other animals living in his/her home. It is highly recommended that other canines living in the home be spayed or neutered. Accelerant detection canines shall not be placed in the home where an aggressive canine is already living.
- Agree to be interviewed by the Accelerant Detection Canine Training Agency (ADCTA), if necessary.
- Adhere to the policies of the ADCTA regarding the canine while in training, and continue to adhere to those policies once the canine and handler are certified.
- Adhere to the policies and guidelines of the DCFEMS at all times.
- Attend, and successfully complete annual re-certification conducted by the ADCTA. Failure of the canine to successfully complete annual certification through any failure of the handler to follow procedures, including but not limited to failure to follow ADCTA procedures will result in disciplinary action which could include revocation of all additional pay and titles.

1. Be required to keep accurate training records. Those records shall be submitted monthly.
2. Be required to submit reports of each incident that the canine responds to, as well as other reports required by the Fire Marshal.
3. Be committed to the canine program for a minimum of 5 years., and is prohibited from handling more than one canine during that period.
4. Maintain a *copy* of the health records of the canine and submit originals of all records pertaining to the health of the canine as they are produced.
5. Submit monthly reports to the Fire Marshal on the use and training of the canine.
6. May be required to submit reports to the ADCTA when requested.
7. Agree to report for duty out-of-town on short notice, to support the ADCTA agency when necessary (if canine is trained by ATF).
8. Agree to a home visit by a member designated by the Fire Marshal prior to selection if deemed necessary.

The canine shall be used for official business only; and the canine is the property of the DC Fire and EMS Department until retired from duty.

8. **Compensation**

The canine handler will be compensated at the rate of Class 2, C Investigator/Armed after successfully meeting all requirements set forth in this announcement. In addition, the member will receive two hours overtime daily, for the care and training of the canine. The daily overtime is reduced by the number of days that the canine is not in the handler's care.


Adrian H. Thompson
Fire/EMS Chief



# MEMORANDUM



| Series | Number | Originating Unit | Effective Date | Expiration Date |
|--------|--------|------------------|----------------|-----------------|
| 2006 | 93 | FPD | May 03, 2006 | June 2, 2006 |

**Subject:**

## Members Interested in the Position of Accelerant Canine Handler.

The Department is attempting to develop a list of members interested in the position of Accelerant Canine Handler, assigned to the Fire Investigations Unit of the Fire Prevention Division. This list will be utilized to select candidates for any vacancies that may occur in the future.

**Description of Duties:** Qualified members would undergo intense training as an Accelerant Canine Handler, and if selected, would be responsible for the care of the animal and the many duties as required by the position. These duties include but are not limited to:

- Commitment to maintaining and training the canine 7 days a week.
- Not be involved in any outside employment that would interfere with his/her duties as the Canine Handler.
- Agree to maintain the animal in the home. At no time is the animal allowed to live outside.
- Inform the Fire Marshal of any other animals in the home. It is highly recommended that those pets be spayed or neutered, and further, no Accelerant Canine will be placed in a home where an aggressive canine is already living.
- Agree to take the canine as a pet after retirement of the animal, assuming responsibility for the care and expense of the animal.
- Agree to be interviewed by, adhere to the policies of, attend and successfully complete the initial training and annual recertification's, of the Accelerant Detection Canine Training Agency [ADCTA], known as Maine Specialty Dogs, Inc.
- Adhere to the guidelines of the DCFEMS at all times.
- Maintain and submit accurate training records, on both daily canine training and for annual certification.
- Submit monthly records to the Fire Marshal on the use of the canine on fire or emergency scenes.
- Maintain a complete file of the health records of the canine, and then submit same on a regular basis.
- Agree to be in an "on call" status while on platoon days off for incidents requiring the canine.
- Members may be required to attend the Institute for Police Science, to acquire police powers. This requirement will be indicated in any future vacancy announcements.

Memo-2006-93                                               Page 2

This is a small sample of the requirements for duty and the commitment required to properly perform the task of Canine Handler.

Members interested for consideration shall submit a Special Report to Battalion Fire Chief John Burger, Fire Prevention Division, indicating such. This report should include any specialized training that the member feels would qualify him/her as the best available candidate. These Special Reports must be submitted by the close of business on June 1, 2006 for consideration.

Adrian H. Thompson
Fire/EMS Chief

# CHARGE QUESTIONNAIRE

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on back before completing this form.

| | EEOC Use Only | Name (Intake Officer) |
|---|---|---|

Please answer the following questions, telling us briefly why you believe you have been discriminated against in employment. An officer of the EEOC will talk with you after you complete this form.

NAME _Harold_ _C_ (Please Print) _Lindsey_     DATE _6/ /06_
     (First)     (Middle Name or Initial)     (Last)

ADDRESS _6622 Mastbrook dr._     TELEPHONE NO. (Include area code) _301 749 7806_

CITY _Ft. Wash._     STATE _Md_     ZIP _20744_     COUNTY _P.G._

Please provide the name of an individual at a different address in your local area who would know how to reach you.

NAME _Mansour Lindsey_     RELATIONSHIP _Son_     PHONE _202 270 3232_

ADDRESS _Six St NE_     CITY _Wash_     STATE _D.C._     ZIP _20_

I believe I was discriminated against by: (Check those that apply)

[X] EMPLOYER     [ ] UNION (Give Local No.)     [ ] EMPLOYMENT AGENCY     [ ] OTHER (Specify)

APPROX NO. EMPLOYED BY THIS EMPLOYER

NAME _D.C. Fire Dept._     NAME _E-18, T-3_

ADDRESS _1923 Vermont Ave. NW_     ADDRESS _414 8__

CITY, STATE, ZIP _Wash D.C 20001_     CITY, STATE, ZIP _Wash D.C 20003_

If you checked "Employer" above, are you now employed by the Employer that you believed discriminated against you?

YES: From _May 06_     NO: I applied for _____     OR: I was employed as _____
     (date)     (position)     (position)

_Sergeant_     on _____     until _____     I was _____
(current position)     (Date)     (date)     (laid off, fired, etc.)

What action was taken against you that you believe to be discriminatory? What harm, if any, was caused to you or others in your work situation as a result of that action? (if more space is required, use reverse.)

_The Fire Dept. Sent a Sergeant to receive full training in becoming the canine handler and gave him the position without opening up the position to anyone in the department. I am by far the most qualified K9 Handler in the department and they failed to open it to me because of my age. The current Handler is younger than 40 and have no experience_

WHAT WAS THE MOST RECENT DATE THE HARM YOU ALLEGED TOOK PLACE? _____

EEOC Form 283 (10/94)

Why do you believe this action was taken against you?

Check the one (s) that apply: Race ( ) Sex ( ) Color ( ) Religion ( ) National Origin ( ) Age ( ✓ ) Disability ( ) Other ( )

For each one that you checked above, please specify the particular race, sex, etc that pertains to you. For any block(s) that you checked,

explain why you believe this was the reason for the action taken against you.

The present or current officers in charge know that
I am the most qualified and never open it
up or made mention of it. They silently slipped
A younger person in to take the position
who was no where near the best qualified

Normally, your identity as a complainant will be disclosed to the organization which allegedly discriminated against you.

Do you [ ] consent or [ ] not consent to such disclosures?

Have you sought assistance about the action you think was discriminatory from any agency, from your union, an attorney, or from any other source? [ ] No [ ✓ ] Yes (If answer is yes, complete below.)

NAME OF SOURCE ASSISTANCE   Dy Boff & Associates        DATE 6/4/06

RESULTS IF ANY: Advised me to come here

Have you filed a complaint about the action you think was discriminatory with any other Federal, State, or Local Government Anti-discrimination agency? [ ✓ ] No [ ] Yes (If answer is yes, complete below.)

NAME OF SOURCE ASSISTANCE _____     DATE _____

RESULTS IF ANY: _____

Have you filed an EEOC Charge in the past? [ ] No [ ✓ ] Yes (if answer is yes, complete below)

| APPROX. DATE FILED | ORGANIZATION CHARGED | CHARGE NUMBER (IF KNOWN) |
| --- | --- | --- |

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE                                          DATE

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 283, Charge Questionnaire (12/93).

2. **AUTHORITY.** 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)

3. **PRINCIPAL PURPOSE.** The purpose of this questionnaire is to solicit information in an acceptable form consistent with statutory requirements to enable the Commission to act on matters within its jurisdiction. When this form constitutes the only timely written statement of allegations of employment discrimination, the Commission will, consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(b), consider it to be a sufficient charge of discrimination under the relevant statute(s).

4. **ROUTINE USES.** Information provided on this form will be used by Commission employees to determine the existence of facts relevant to a decision as to whether the Commission has jurisdiction over allegations of employment discrimination and to provide such charge filing counseling as is appropriate. Information provided on this form may be disclosed to other State, local and federal agencies as may be appropriate or necessary to carrying out the Commission's functions. Information may also be disclosed to charging parties in litigation of or in connection with litigation.

5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.** The providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge of discrimination. It is not mandatory that this form be used to provide the requested information.

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Harold C. Lindsey | From: Dallas District Office |
|---|---|
| 6622 Mastbrook Dr. | 207 S. Houston St. |
| Fort Washington, MD 20744 | 3rd Floor |
| | Dallas, TX 75202 |

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 570-2006-01324 | Janet V. Elizondo, Deputy Director | (214) 253-2852 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____    7/30/07

Michael C. Fetzer,    *(Date Mailed)*
Director

Enclosures(s)

cc:
| Detria J. Liles Hutchinson | Donna Williams Rucker |
|---|---|
| Diversity/EEO Program Manager | Attorney at Law |
| DCFIRE/EMS | 8401 Colesville Road, Suite 501 |
| 1923 Vermont Ave, N.W. | Silver Spring, MD. 20910-3349 |
| Washington, DC 20001 | |

Enclosure with EEOC
Form 161 (3/98)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit <u>before 7/1/02</u> -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --    Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT COLUMBIA

- - - - - - - - - - - - - -x
                              :
HAROLD LINDSEY               :
                              :
        Plaintiff,           :
                              :  Civil Action No.
     v.                       :  1:02cv1592(RMC)
                              :
DISTRICT OF COLUMBIA         :
                              :
        Defendant.           :
                              :
- - - - - - - - - - - - - -x

                    Washington, D.C.
                    Thursday, January 29, 2004

     The deposition of CHIEF ADRIAN H. THOMPSON,

called for examination by counsel for Plaintiff in

the above-entitled matter, pursuant to notice, in

the offices of Corporation Counsel, 441 Fourth

Street, Northwest, Sixth Floor, Washington, D.C.,

convened at 11:55 a.m., before Sandy Medford Nelson,

a notary public in and for the District of Columbia,

when were present on behalf of the parties:

39

```
 1   2001 period?

 2      A    No, ma'am.

 3      Q    That's what I'm trying to ask.  I don't

 4   believe I found out what position you held before

 5   you were interim.

 6      A    Assistant Fire Chief of Operations.

 7      Q    That's what you were in 2000?

 8      A    Yes, ma'am.

 9      Q    Thank you.  And you knew Harold Lindsey

10   before you became Fire Chief, correct?

11      A    Yes, ma'am.

12      Q    All right.  And how did you know Fire

13   Chief Lindsey?

14      A    Worked as a Sergeant in Fire Prevention

15   Division when I first arrived there.

16      Q    He was working as a Sergeant?

17      A    Yes, ma'am.

18      Q    Can you tell me the difference, if there

19   is any, between the career path working in

20   firefighting versus an employee working in the Fire

21   Investigation and Arson Unit?

22      A    Initial career paths are pretty much the
```

40

1    same.  You recruit school, firefighting,

2    supression, then you apply for the Fire Prevention

3    Division as an Inspector, if you accept it, you

4    know.  The rest of that situation, you know, just

5    being Inspector, Inspector Technician, would go to

6    the Investigator.

7         Q    It's a different career path?

8         A    To some degree, after you pass the initial

9    Firefighter stage, yes, ma'am.

10        Q    After you get passed the Firefighter

11   stage?

12        A    The initial firefighting stage, yes,

13   ma'am.

14        Q    That's what I'm speaking about.

15        A    Um-hum.

16        Q    And after that, is it a different career

17   path?

18        A    Yes, ma'am, to some degree.

19        Q    And how is it different?

20        A    In terms of your skills, what you're

21   required to do and perform in terms of your job

22   function.

p. 2

 

# MEMORANDUM

| Series | Number | Originating Unit | Effectiva Date | Expiration Dale |
|--------|--------|------------------|----------------|-----------------|
| 2001 | 91 | FPD | July 27, 2001   / | August 16, 2001 |

Subject:

### Announcement for Accelerant Detection Canine Handler

### Announcement for Accelerant Detection Canine Handler

Members interested in becoming Accelerant Detection Canine Handlers shall submit a FD Form 118.4 and a Special Report, including endorsements, to the Fire Marshal requesting consideration. Members may list any special qualifications and/or previous experience. Selected members will work closely with the Fire/Arson Investigation Unit, and shall receive training in the field of Fire Investigation in addition to the specialized training necessary to become a canine handler. Each candidate submitting u completed application, prior to the specified deadline, will be interviewed, and the final selection shall be made by the Fire Marshal. Applications must be received not later than the close of business (164S hours), 14 days from the date of this announcement.

Member(s) selected to become handlers shall meet t;<e following requirements:

**Memo 91-01 continued**

**Maintain a *copy* of the health record of the canine and have it available upon request.**
**Submit monthly reports to the Fire Marshal on the use, and training of the cani&c. Submit**
**quarterly reports to the training agency.**
**Agree that he/she rsay be cafflcd out of tov/n on short notice to support the training agency**
**woen necessary.**
**Ensure that the canine is used for ornciai busiucss**

*Chuck Ronnie Le*

few  */L* Koitu?

FireTEMS Chi:

81



# SPECIAL ORDER

| | | |
|---|---|---|
| *Series* | *Number* *Originating UnlJ* | |
| 2002 | 31   FPD | |

**Effective Date** 2002   **Expiration Date** July 4, 2002

**Subject:**  **Vacancy Announcement**
**for Accelerant**   ~~Detection~~ Canine Handler Technician

A vacancy exists in the Fire/Arson Investigation Ui tit for
the position of Canine Handler Technician. The position
will be filled using the selection process o jtfined in this announcement. Requirements are subject to change as
the position dictates.



1.   **ElipibiUtv:**

Firefighters in Classes 1 through 3 of the £ istrict of Columbia Fire and EMS Department's Fire
Service Salary Schedule. To be eligible for consideration, the firefighter must have a minimum of
five years of service, continual or cumulativ e, in the D.C. Fire and EMS Department.

2.   **How to Apply:**

Members shall submit written application in of command, with endorsements, include length of service in the Department, Department, and any qualifications or may submit FD Form 1 18.4 to list any spec College courses listed on the FD Form 118. official transcript to:

the Special Report format through their regular chain to Fire M irshal Brace Cowan. The written application shall a brief history of the applicant's service in the relev; mt experience regarding the position. The applicant al training, or formal courses related to the position. 4- must be confirmed by an official transcript. Send

OfiSce of the Fire Marshal 441 4*
Street NW, # 370 Washington, DC
20001 Attention: BFC Joseph
Deaton

3.   **Application Deadline:**

**Applications shall be received in the Office >f the Fire Marshal by the close of business, 14 calendar
days from the date of this announcement. / pplications received after the deadline shall not be
considered. *It is the responsibility of the a iplicant to submit the application and a copy in a ly
manner. The original shall be subi nitted through the chain-of-command to his/her
tim
Battalion Fire Chief. A cow shall be submitted DIRECTLY to the Fire Marshal.***

SO 31, Series 2002: Vacancy Announcement, Canine Randier 4.

Company/Platoon Commanders shall endor » recommendations. Application shall not be endorsement of the platoon/company coi

**Endors ements /Recom**

**mendations;**

the applications (Special Reports) with ( lelayed at any level awaiting endorsement. The >mnrander shall include the applicant's:

a.    Performance with respect to                 his/her current duties and responsibilities.
b.    Knowledge and adherence to Depar ment rules, regulations, orders, and guidelines.
c.    Ability to work effectively with sup( rior officers and fellow members.
d.    Disciplinary record for the past thre< i years.

5.    **Selection Process:**

Applicants will be selected and will become *candidates* for the position after successfully participating in the following selection proc   Candidates who have been selected shall >w *before* :ss successfully complete the process listed   being placed in the position. Applicants bel< must:

a.    Submit to an oral interview by a self cted board including the Fire Marshal, the Battalion
        Fire Chief, the Captain of the Fire/A rson Investigation Unit (or their designees) , and a
        representative of the IAFF Local - 3 6.
b.    A review of the applicant's person™ 1 folder shall be included in the oral interview phase, c.
Pass a physical examination, and a p sychological test performed at the PFC. d.    Must be in a full
duty status at time )f selection, with no restrictions. e.    Successfully complete a backgrounc
investigation conducted by the Metropolitan Police
        Department and the FBI.
f .    Member will be detailed to the FPD upon completion of steps 5a through 5e, g.    Participate in
selected training, and; uccessfully pass written examinations as directed by the
        Fire Marshal. Failure to successful!;' pass internal examinations, those developed by the
        DC F&EMSD Fire/Arson Investigation Unit, shall result in one make-up examination which
        the applicant must pass to be retained in the candidate process, h.    Applicant must perform
satisfactoril / during selection process phase before beginning the
        probationary period.
        Applicant shall be disqualified from the process for failure to successfully complete any of
        the selection criteria.

        **Applicants are directed to study the Order Book. Bulletin Nos. 6.12.22. 23,24.25.
        35.43.44.46.51.59.66.74.75. and 78 and the Ddmar Firefiehter's Handbook Chapters
        4,5.8.12.13.17.20.2ll 25, and 30. This material will prepare the applicant**
        for the oral interview.              1

SO 31, Series 2002: Vacancy Announcement, Canine Randier

**6.    Requirements After Selection:**

Once candidates have successfully completed the selection process, they will be placed in the position in a probationary status and will receive the necessary training to carry out the duties of the position. The applicant will then be in a *Trainee* status and must meet the criteria listed below during and after the probationary period:

a.    Successfully complete a one year pn >bationary period.
b.    Obtain and maintain certifications in inspection, investigation, and other related areas as required by the Fire Marshal. He/sh; shall become certified in inspections and investigation within the first two years of assignm *snt.* c.
The Handler shall:
1.    be committed to maintaining and training the canine 7 days a week.
2.    be in excellent health, and on ist be able to stand for long periods, bend, crouch, and be able to lift the canine if necessary.
3.    not be involved in any outside employment which conflicts with his/her duties as the canine handler.
4.    agree to maintain the canine        inside the home. At no time must the canine be allowed to live outside.
5.    agree to take the canine as a pet, and accept responsibility for the care and expense of the canine, after it is retirea.
6.    inform the Fire Marshal of a iiy other animals living in his/her home. It is highly recommended that other can nes living in the home be spayed or neutered. Accelerant detection canines shall not be placed in the home where an aggressive canine is already living.
7.    agree to be interviewed by tt e Accelerant Detection Canine Training Agency (ADCTA), if necessary.
8.    adhere to the policies of the. \DCTA regarding the canine while in training, and will continue to adhere to those j olicies once the canine and handler are certified.
9.    adhere to the policies and gu delines of the DCFEMS at all times.
10.    attend, and successfully com >lete annual certification conducted by the ADCTA. Failure of the canine to succ< ssfully complete annual certification could result in the dismissal of the Handler, and revocation of all additional pay and titles.
11.    be required to keep accurate training^ records. Those records wfll be made available upon request.
12.    be required to submit reports of each incident the canine responds to, as well as other reports required by the Fire Marshal.
13.    be committed to the canine p rogram for a minimum of 5 years, and is prohibited from handling more than one canine during that period.
14.    maintain a *copy* of the health records of the canine and shall make those records available upon request.
15.    submit monthly reports to thi; Fire Marshal on the use, and training of the canine.

£ 3 of 4

SO 31, Series 2002: Vacancy Announcement, Canine Randier

16.     may be required to submit re ports to the ADCTA when requested.
17.     agree to report for duty out->f-town on short notice, to support the ADCTA agency when necessary (if canine is' rained by ATF). d.     The canine shall be used for offici il business only; and e.     The canine is the property of the DC Fire and EMS Department until retired from **duty.**

**The Canine Handler shall aoolv for the position of Fire/Arson Investigator Technician during the <u>first two years subsequent to position assignmer t and after satisfactory completion of initial canine</u>**

**<u>Applicants who are not successful in completing any phase of the above process, during the selection or training phases, shall be reassigned as the needs of the Department dictate.</u>**

7.     <u>Compensation</u>

The handler will receive Class Two technici in pay after successfully completing all certifications required under this announcement. In addit on, he/she shall receive one hour overtone daily, and not to exceed fourteen hours per pay period, of overtime for the care and training of the canine. The one hour daily overtime is reduced by t le number of days that the canine is not in the handler's care, e.g., one day's absence would reduce tjhe overtime by one hour.

Ronnie Few
Fire/EMS Chief

9-d

frO 81